**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Dec 18 2013, 10:49 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**CRAIG W. GRAHAM**
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**AARON J. SPOLARICH**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: E.B., K.B., T.B., and M.J., (Minor Children),

and,

J.W., (Mother),

    Appellant-Respondent,

    vs.

THE INDIANA DEPARTMENT OF CHILD SERVICES,

    Appellee-Petitioner.

)
)
)
)
)
)
)
)
)
)
)
)    No. 10A05-1303-JT-108
)
)
)
)
)
)

APPEAL FROM THE CLARK CIRCUIT COURT
The Honorable Daniel F. Donahue, Senior Judge

**December 18, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BARNES, Judge**

### Case Summary

J.W. ("Mother") appeals the termination of her parental rights to her four children: E.B., K.B., T.B., and M.J.  We affirm.

### Issues

The restated issues before us are:

  I.    whether the trial court held a timely termination hearing with respect to E.B., K.B., and T.B.; and

  II.   whether there is sufficient evidence to support the termination of Mother's parental rights to M.J.

### Facts

Mother has four children:  E.B., born in 2005, K.B., born in 2007, T.B., born in 2009, and M.J., born in 2011.  The father of E.B., K.B., and T.B. is deceased.  DCS first became involved in Mother's life on April 1, 2010.  On that date, Mother was arrested on multiple counts of prescription fraud, and the Department of Child Services ("DCS") removed E.B., K.B., and T.B. from Mother's care and placed them with a relative because of Mother's subsequent incarceration.  The children were found to be CHINS.  After Mother received a sentence of probation and home detention for the criminal charges, DCS arranged to provide services at Mother's home due to her lack of transportation, but her

compliance with the services was "hit or miss." Tr. p. 200. Mother's visitation with the children also "was not consistent." Id. at 201. In August 2010, the children were placed back with Mother because she was complying with her supervised probation, and her drug screens during this time were negative. DCS closed this CHINS case in November 2010.

On April 5, 2011, DCS went to Mother's home, where she was living with her boyfriend, and discovered that the house had no electricity, very little food, and was cluttered with trash and clothing. Mother was pregnant with M.J. at the time. Mother also submitted to a drug screen on that date and, although Mother had told the DCS caseworker that her problems with drug addiction were in the past, the screen revealed the presence of methamphetamine, amphetamine, and methadone. On April 12, 2011, Mother was arrested after failing to appear in court to answer ten new charges of prescription fraud. DCS removed E.B., K.B., and T.B. from Mother's care on that date and initiated new CHINS proceedings. These children later moved in with their paternal grandparents in Alabama, where they continue to reside. On July 11, 2011, Mother submitted to another drug screen that revealed the presence of amphetamines, oxycodone, and oxymorphone; Mother did not have a valid prescription for any of these drugs.

M.J. was born on July 20, 2011. She tested positive for opiates and was removed from Mother's care at the hospital and placed in foster care, where she has continuously resided. Like her half-siblings, M.J. was found to be a CHINS.

Mother was sentenced through a drug court for her April 2011 prescription fraud charges. She was subjected to regular drug screening. Between May 2011 and March 2012, Mother tested positive for illicit drug use on nine occasions, primarily for

3

hydrocodone and other opiates, as well as amphetamines. In December 2011, she was temporarily incarcerated for multiple drug court violations but apparently was released in January 2012. In March 2012 Mother was ordered to participate in an inpatient treatment program, but she left the program without permission. On May 7, 2012, Mother's drug court placement was revoked, and she was incarcerated until December 20, 2012. Mother thereafter was placed in a halfway house.

Before Mother was re-incarcerated in May 2012, she did not consistently participate in DCS-ordered services, nor did she visit consistently with any of the children. For example, Mother was supposed to meet with a family counselor weekly, but she failed to meet with the counselor at all in September 2011, and met just once in October 2011, just once in November 2011, and never in December 2011. When Mother was taken into custody, the counselor closed the case. The counselor attempted to restart sessions with Mother in February 2012; at first, Mother attended regularly, but she stopped attending entirely after making only one visit in March 2012. Mother also frequently cancelled scheduled supervised visits with the children or was late to them. Her last visit with E.B., K.B., and T.B. took place in February 2012, and her last visit with M.J. took place in March 2012.

On June 19, 2012, DCS filed a petition to terminate Mother's parental rights as to E.B., K.B., and T.B. On July 10, 2012, DCS filed a petition to terminate Mother's and M.J.'s father's parental rights as to M.J. The trial court scheduled a final termination hearing as to all of the children for August 8, 2012. On August 7, 2012, the CCS for M.J.'s case indicates that Mother moved to continue the final termination hearing, which was

4

granted over DCS's objection.[1] The trial court conducted a hearing on September 13, 2012, at which opening remarks regarding termination were made but no evidence was presented, and the matter was continued. The trial court held another hearing on October 11, 2012, at which time Mother again moved for a continuance, and the matter was continued until October 25, 2012 over DCS's objection. On that date, Mother again moved for a continuance, and the final TPR hearing was rescheduled for January 17, 2013 over DCS's objection. The trial court did hold a hearing on that date, after denying another continuance request made by Mother at the beginning of the hearing. At the end of the day on the 17th, the trial court continued the hearing until January 31, 2013, and concluded the hearing on that date.

At the termination hearing, Mother admitted she never completed a substance abuse program nor a parenting class, she did not visit her children consistently, and she did not participate in offered DCS services. She also testified that she was unemployed and expected to be in the halfway house for six to nine months and that she could not care for her children at that time. She planned on moving to Alabama with M.J. and M.J.'s father after she left the halfway house, although she had no living plans there, and M.J.'s father had a positive drug screen in December 2012.

---

[1] The CCS for E.B., K.B., and T.B.'s case is less clear than M.J.'s CCS as to whether Mother moved for a continuance of the August 8, 2012 hearing, or whether that hearing was even intended to be a final termination hearing. However, it is clear that the trial court consolidated hearings for all four children; M.J.'s CCS clearly refers to the August 8, 2012 hearing as a final termination hearing and states that Mother moved to continue that hearing on August 7, 2012. In general, the CCS for E.B., K.B., and T.B.'s case is less detailed than that of M.J.'s case, despite the hearings for all four children clearly being consolidated.

As for E.B., K.B., and T.B., they were doing well living with their paternal grandparents in Alabama, and DCS recommended that they continue living there after termination. As for M.J., she was doing well living with the foster mother who had cared for her since birth, and the foster mother expressed her desire to adopt M.J. after termination. The DCS caseworker believed it was appropriate to terminate Mother's parental rights to all four children. The CASA assigned to the case believed it was appropriate to terminate Mother's parental rights to E.B., K.B., and T.B., but also believed it was premature to terminate her rights as to M.J. The CASA testified, "I feel that [M.J.] is at an age to where she could be reunited with her parents," and also that Mother could possibly care for one child in the future but not four children. Tr. p. 230.

On February 8, 2013, the trial court issued two separate orders terminating Mother's parental rights to E.B., K.B., and T.B., and her and M.J.'s father's parental rights to M.J. Mother initiated two separate appeals from these orders and filed one brief addressing E.B., K.B., and T.B., and a separate brief addressing M.J. We later consolidated these appeals. M.J.'s father has chosen not to appeal the termination of his parental rights.

## Analysis

### I. Timing of Final Hearing

Mother argues with respect to E.B., K.B., and T.B. that the trial court exceeded statutory time limits for conducting a termination of parental rights hearing.[2] On the date

---

[2] Mother does not make this argument with respect to M.J.

that DCS filed its termination petition regarding E.B., K.B., and T.B., June 19, 2012,

Indiana Code Section 31-35-2-6 provided:

> Except when a hearing is required after June 30, 1999, under section 4.5 of this chapter, the person filing the petition may request the court to set the petition for a hearing. Whenever a hearing is requested under this chapter, the court shall:
>
> > (1)     commence a hearing on the petition not more than ninety (90) days after a petition is filed under this chapter; and
> >
> > (2)     complete a hearing on the petition not more than one hundred eighty (180) days after a petition is filed under this chapter.

Ind. Code § 31-35-2-6 (2011).

In 2012, the legislature amended this statute, effective July 1, 2012, to read:

> (a) Except when a hearing is required after June 30, 1999, under section 4.5 of this chapter, the person filing the petition shall request the court to set the petition for a hearing. Whenever a hearing is requested under this chapter, the court shall:
>
> > (1)     commence a hearing on the petition not more than ninety (90) days after a petition is filed under this chapter; and
> >
> > (2)     complete a hearing on the petition not more than one hundred eighty (180) days after a petition is filed under this chapter.
>
> (b) If a hearing is not held within the time set forth in subsection (a), upon filing a motion with the court by a party, the court shall dismiss the petition to terminate the parent-child relationship without prejudice.

I.C. § 31-35-2-6.

7

Mother argues that because the trial court did not complete the termination hearing until January 31, 2013—or on the 227th day after the termination petition was filed for E.B., K.B., and T.B.—it violated Indiana Code Section 31-35-2-6's 180-day time limit for completing a termination hearing. Mother does not specify whether she believes the previous version of the statute is controlling, or the current version. Regardless, to the extent the trial court completed the termination hearing after the statutory deadline, Mother invited any error in it doing so. When a party requests continuances of a termination hearing, or joins in or fails to object to an opposing party's continuance motion, he, she, or it has invited any error in a trial court's failure to hold a termination hearing within the statutory time frame. See In re A.D., 737 N.E.2d 1214, 1216-17 (Ind. Ct. App. 2000) (holding guardian ad litem invited claimed error in failing to commence termination hearing within statutory timeframe where it did not object to three continuance requests by parent, and office of family and children joined in one of the continuances).

Here, Mother requested and was granted continuances of the termination hearing on at least three occasions and unsuccessfully attempted to obtain a fourth continuance, over DCS's objections.[3] Under the circumstances, Mother plainly invited any alleged error in the termination hearing not being completed no more than 180 days after the termination petition was filed.

---

[3] The CCS for both cases only records DCS's objection to Mother's continuance request of October 12, 2012. However, counsel for DCS stated at the beginning of the January 17, 2013 hearing, in objecting to Mother's renewed continuance motion, that it also had objected to the continuance requests of August 7, 2012, and October 25, 2012. Mother did not contradict this assertion at the hearing, nor does she attempt to do so on appeal.

8

Mother also argues with respect to E.B., K.B., and T.B. that DCS "failed to exhaust [its] administrative remedies," presumably by not giving her additional time after her most recent release from incarceration to participate in services. Appellant's Br. p. 3. Mother fails to cite any authority for the proposition that the "exhaustion of administrative remedies" doctrine should apply to CHINS/termination of parental rights cases. In fact, directly to the contrary, the law regarding termination of parental rights does not require DCS to offer any services to a parent to attempt to correct childcare deficiencies. In re I.A., 934 N.E.2d 1127, 1136 (Ind. 2010). Mother's "exhaustion of administrative remedies" argument thus fails.

## II. Sufficiency of Evidence Regarding M.J.

Next, we address Mother's argument that there is insufficient evidence to support the termination of her parental rights to M.J.[4] "When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility." Id. at 1132. We consider only the evidence and reasonable inferences most favorable to the judgment. Id. "We must also give 'due regard' to the trial court's unique opportunity to judge the credibility of the witnesses." Id. (quoting Indiana Trial Rule 52(A)). Where a trial court enters findings of fact and conclusions thereon, as the trial court did here, we apply a two-tiered standard of review. Id. "First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment." Id. We will set aside the trial court's judgment only if it is clearly erroneous, which occurs if the

---

[4] Mother does not make this argument with respect to E.B., K.B., and T.B.

9

findings do not support the trial court's conclusions or the conclusions do not support the judgment.  Id.

A petition to terminate a parent-child relationship must allege:

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>>
>> (iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

I.C. § 31-35-2-4(b)(2). DCS has the burden of proving these allegations by clear and convincing evidence. I.A., 934 N.E.2d at 1133.

Mother does not specify which of the above four statutory elements for a termination case DCS failed to prove here. She seems to claim that there is a reasonable probability that the reasons for M.J.'s removal from her care will be remedied; the primary reason for M.J.'s removal, of course, was Mother's drug abuse problem, which has led to multiple legal problems for Mother and caused M.J. to be born with opiates in her system. Mother relies in large part on the CASA's opinion that it would be premature to terminate her parental rights to M.J. and that Mother was demonstrating some progress against her drug addiction in the halfway house. However, the trial court was not required to accept the CASA's recommendation. The CASA's testimony was just one piece of evidence among many for the trial court to consider, and that testimony was in direct conflict with the testimony of the DCS caseworker, who believed termination as to M.J. was appropriate at this time. For us to say the trial court needed to accept the CASA's recommendation would constitute reweighing the evidence, which we cannot do.

As for the entirety of the evidence regarding whether the conditions that led to M.J.'s removal will be remedied, courts may consider any services offered by DCS and a parent's response to those services. In re L.B., 889 N.E.2d 326, 339 (Ind. Ct. App. 2008). "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that

11

there exists no reasonable probability that the conditions will change." Lang v. Starke County Office of Family & Children, 861 N.E.2d 366, 372 (Ind. Ct .App. 2007), trans. denied. "When evaluating a parent's habitual pattern of conduct, courts have properly considered, among other things, evidence of a parent's prior drug and alcohol abuse, history of neglect, and failure to provide financial support." L.B., 889 N.E.2d at 339. Additionally, the failure to exercise the right to visit one's own children may demonstrate a lack of commitment to preserving the parent-child relationship. Id.

Mother claims that she should have been granted additional time to participate in DCS services because she was incarcerated for several months during the pendency of the CHINS action and was unable to participate in services. This ignores the fact that Mother's incarceration was a direct result of her continued substance abuse problems, even after being arrested for the second time in a year for prescription drug fraud and being placed in a drug court program to attempt to solve her substance abuse problems. Despite that assistance, Mother continued to repeatedly abuse drugs and to violate the terms of her drug court placement. Before her incarceration in May 2012, Mother also failed to regularly participate in counseling services offered by DCS and failed to consistently exercise visitation. She has never successfully completed any DCS counseling program or any substance abuse program.

Mother also had one previous opportunity, in 2010, to solve her drug abuse problem; despite apparently not using drugs for several months, she began regularly abusing drugs yet again in 2011 while pregnant with M.J. Under the circumstances, the trial court was not required to accept that Mother's apparently not using drugs while incarcerated and

12

during one month of living in a halfway house was a guarantee that she would not relapse. This is especially true given that Mother's future plans included returning to living with M.J.'s father, who had tested positive for illicit drug use just one month before the termination hearing despite undergoing substance abuse treatment. There is sufficient evidence of a reasonable probability that the conditions that led to M.J.'s removal from Mother's care would not be remedied.

To the extent Mother implies that termination is not in M.J.'s best interests, we also reject that claim. In determining whether termination is in the best interests of a child, court may look beyond the factors identified by the DCS and look to the totality of the evidence. In re I.A., 903 N.E.2d 146, 155 (Ind. Ct. App. 2009). In making a best interests determination, courts must subordinate the interests of the parent to those of the child. Id. Courts need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Id. Termination of parental rights is in a child's best interests if his or her emotional and/or physical development is threatened. Stewart v. Randolph County Office of Family & Children, 804 N.E.2d 1207, 1212 (Ind. Ct. App. 2004), trans. denied.

Mother's illicit drug use clearly was causing repeated upheaval in the lives of her children because of her legal troubles, and Mother also directly threatened M.J.'s health by illicitly using drugs while pregnant. M.J. has never lived with Mother, and Mother visited only inconsistently at best with M.J., even when she was not incarcerated. M.J. has lived constantly with a foster mother, with whom M.J. is doing very well and is bonded, and who wants to adopt M.J. There is sufficient evidence that termination is in M.J.'s best interests.

13

**Conclusion**

Mother invited any alleged error with respect to the trial court not timely concluding a hearing regarding termination of her parental rights to E.B., K.B., and T.B. There is sufficient evidence to support the termination of her parental rights to M.J. We affirm.

Affirmed.

ROBB, C.J., and BROWN, J., concur.